Glade A. PETERSON, Plaintiff,

v.

UNITED STATES of America and Joyce Simpkins, Revenue Officer, Internal Revenue Service, Defendants.

No. C 81–0021J.

United States District Court, D. Utah, C. D.

March 10, 1981.

Craig P. Orrock, Merrill G. Hansen, Salt Lake City, Utah, for plaintiff.

Barbara W. Johnsen, Asst. U. S. Atty., Salt Lake City, Utah, for defendants.

## MEMORANDUM OPINION

JENKINS, District Judge.

The parties' cross-motions for summary judgment and the defendants' motion to dismiss came on for hearing before this Court on February 6, 1981. Each motion was supported by a memorandum of authorities. This Court, having reviewed the pleadings and memoranda herein, and having heard and considered the arguments of the parties ruled and does now rule on the aforementioned motions as follows:

## I. DISMISSAL OF THE COMPLAINT AS AGAINST MS. JOYCE SIMPKINS INTERNAL REVENUE SERVICE OFFICER

■ On its face, the plaintiff's complaint alleges a claim arising under 26 U.S.C. § 7426, which provides in pertinent part:

(a) *Actions permitted.*—

(1) *Wrongful levy.*—If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary [of the Treasury] or his delegate.

Subsection (d) of section 7426 makes it abundantly clear that actions under this section are to be brought against the United States rather than individual officers of the federal government:

(d) *Limitation on rights of action.*—No action may be maintained against any officer or employee of the United States (or former officer or employee) or his personal representative with respect to any acts for which an action could be maintained under this section.

Consequently, the complaint was dismissed by Order of this Court entered on February 17, 1981, as against Internal Revenue Service Officer Joyce Simpkins. Plaintiff did not oppose the motion to dismiss.

## II. THE MOTIONS FOR SUMMARY JUDGMENT

### (a) *Factual Background*

It appears to this Court that the following factual matters are without substantial dispute:

1. On August 6, 1976, a promissory note and a trust deed securing that note were

executed by Gordon R. Lindeman and Ruth Lindeman in favor of the Lockhart Company, plaintiff's predecessor in interest. The trust deed was recorded August 12, 1976, in Book 4299, at Page 257 as Entry No. 2844789 of the records of the Salt Lake County Recorder, located at Salt Lake City, Utah.

2. The defendant United States of America, by and through its agency, the Internal Revenue Service, recorded notices of federal tax lien in the records of the Salt Lake County Recorder's Office affecting property of the taxpayer Gordon R. Lindeman, dba G. R. Lindeman Co. on several occasions: November 30, 1976; March 11, 1977; September 21, 1977; February 21, 1979; May 7, 1979; and January 17, 1980.

3. Among the property of Gordon R. Lindeman at these times was the tract of real property described as follows:

All of Lot 45, WHITE CITY NO. 6 SUB-DIVISION, according to the official plat thereof on file and of record in the office of the Salt Lake County Recorder.

This property was the subject of the trust deed executed by the Lindemans in favor of the Lockhart Company on August 6, 1976.

4. On May 22, 1978 Gordon R. Lindeman and Ruth L. Lindeman executed another and subsequent trust deed in favor of the Lockhart Company on the tract of real property, securing a second promissory note executed on the same day. This trust deed was recorded at the Salt Lake County Recorder's Office on May 31, 1978, in Book 4682, at Page 30, as Entry No. 3116177 of the records of the County Recorder.

5. On May 31, 1978, Western States Title Company, trustee, executed a Deed of Reconveyance of the August 6, 1976 trust deed to the Lindemans which was recorded on the same day in Book 4682, at Page 29, as Entry No. 3116176 of the records of the Salt Lake County Recorder.

6. On its face, the trust deed executed May 22, 1978 secured a different and larger sum of indebtedness evidenced by a different promissory note than did the trust deed executed on August 6, 1976.

7. Both of the trust deed instruments described above included in their statement of purposes the purpose of securing:

(3) the payment of such additional loans or advances as hereafter may be made to Trustor, or his successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by *this* Trust Deed, . . . (emphasis added)

8. Because of an apparent default by the Lindemans in its payment to Lockhart, a "Notice of Default and Election to Sell Under Deed of Trust" was recorded on April 15, 1980, by W. Clark Burt, the duly appointed successor trustee under the trust deed executed *May 22, 1978*, (emphasis added) giving notice of the trustee's election to sell the real property in question to effect payment of the 1978 note. This notice was recorded in Book 5089, at Page 610, as Entry No. 3423622 of the records of the Salt Lake County Recorder.

9. Notice of the intended sale at public auction on August 19, 1980, at the Courts Building, Salt Lake City, was published in the Salt Lake Times on July 25, August 1 and August 8, 1980. No notice of the intended sale was given in writing, by registered or certified mail or by personal service, not less than 25 days prior to that sale, to the Secretary of the Treasury or his authorized delegate.

10. The plaintiff, Glade A. Peterson, and Home Savers, Inc. were the purchasers at the trust deed sale of the interest in the Lindemans' property reflected in the trust deed executed May 22, 1978.

11. The Internal Revenue Service subsequently gave notice of an intention to sell the property in question pursuant to its recorded lien, such sale to be held on January 15, 1981.

12. Plaintiff filed his complaint and motions for a temporary restraining order and preliminary injunction, commencing the above-entitled proceeding, on January 9, 1981 (TRO), January 14, 1981 (PI), and January 15, 1981 (C). Hearings were held before this Court on January 14 and 15, 1981, at which time a hearing on the merits was

scheduled for February 6, 1981, and the proposed sale of property was rescheduled for February 11, 1981.

(b) *Priority and Effect of the Federal Tax Lien Recorded Prior to July 19, 1980*

Plaintiff Glade A. Peterson asserts in his complaint that the interest in the Lindeman property that he purchased at the August 19, 1980 trustee's sale was purchased free of the recorded federal tax lien affecting the Lindeman property. Peterson argues that his interest in the property derives from the trust deed executed by the Lindemans on August 6, 1976, and that the later documents affecting that property amount to. merely a renewal of the security interest in real property reflected in that original trust deed. The United States conversely asserts that the reconveyance of the 1976 trust deed and the execution of the 1978 trust deed and note extinguished that original obligation and security interest and merely created a new security interest junior in time to the federal tax liens recorded in 1976 and 1977.

 The parties do not dispute the well-settled rule of federal law that the priority of properly recorded federal tax liens in relation to other recorded security interests in real property is to be determined by the principle of "first in time, first in right." *See United States v. Equitable Life Insurance Society of the United States*, 384 U.S. 323, 86 S.Ct. 1561, 16 L.Ed.2d 593 (1966); *T. H. Rogers Lumber Co. v. Apel*, 468 F.2d 14 (10th Cir. 1972). To have priority, a state authorized lien must have been "specific and perfected" at the time that the federal tax lien was recorded. In this case, the 1976 trust deed was perfected as a lien prior to the filing of the federal tax lien; the 1978 trust deed clearly was not perfected. To establish priority over the United States' interest, Peterson must show that the 1978 trust deed related back to, and renewed the 1976 trust deed. This he has failed to do.

 Peterson cites a number of cases in support of his assertion that the legal effect of the 1978 trust deed was the renewal rather than the extinguishment of the 1976 trust deed. A careful reading of those cases reveals little support for the plaintiff's argument and discloses considerable reason for a contrary result. *Potter v. United States*, 111 F.Supp. 585 (D.R.I.1953), cited by plaintiff, deals with the rights of a third party who *subrogated* himself to the rights of a mortgagee whose interest in the mortgaged personal property had priority over a filed federal tax lien. *Potter* holds that subrogation does not extinguish the priority of the mortgage where the third party takes without actual notice and with warranty that the mortgage is free of encumbrances. That decision supports Peterson herein only if it is determined that the 1978 trust deed related back to the 1976 trust deed and its priority, and that Peterson's purchase at trustee's sale amounted only to a simple subrogation to the Lockhart Company's interest, separate questions altogether.

Plaintiff also cites a decision by the United States District Court for the Northern District of Georgia, *United States v. Gant*, 43 A.F.T.R.2d 79–301 (1978), in support of his claim. The *Gant* court, relying on Georgia law, which looks to the intent of the parties to determine whether a later mortgage relates back to an earlier one affecting the same property, concluded that the parties intended that the second mortgage renew the obligation reflected in the first mortgage and held that the second mortgage retained the first mortgage's priority up to the amount secured by the first mortgage. Additional amounts secured by the second mortgage were held to be inferior in priority to the intervening federal tax lien. Following the lead of the *Gant* court, this Court looked to Utah law, particularly the cases cited by the parties, to determine the nature and legal effect of the 1978 transactions. Three cases cited by the parties, *Marketing Systems, Inc. v. Interwest Film Corp.*, 567 P.2d 176 (Utah 1977), *Interstate Trust Co. v. Headlund*, 51 Utah 543, 171 P. 515, 517 (1918) (on petition for rehearing), and *Deseret National Bank v. Burton*, 17 Utah 43, 53 P. 215 (1898), deal with the effect of a renewing promissory note upon

antecedent notes or debts, without any use of mortgages or trust deeds. Whatever the significance of these decisions to the law of negotiable instruments, they give no aid to this Court in interpreting the terms and effect of the documents before it, other than perhaps the statement of the general rule that the intent of the parties should control the "renewal" effect of subsequent promissory notes. Two more cases cited, *First Security Bank of Utah v. Proudfit Sporting Goods Co.*, 552 P.2d 123 (Utah 1976), and *Gray v. Kappos*, 90 Utah 300, 61 P.2d 613 (1936), deal more directly with the law governing renewal of mortgages and trust deeds.

In *Proudfit*, the Utah Supreme Court considered the priority of an intervening judgment creditor in relation to a creditor claiming under a promissory note renewing an earlier note secured by trust deed. The mortgagor in that case had executed the renewal note secured by the original mortgage, which was never released as of record. The judgment creditor argued that the second note represented a new contract (rather than a new mortgage or trust deed) that effectively extinguished the mortgagee creditor's earlier claim and interest in the property. Emphasizing the fact that the original trust deed had not been released as of record, the court in *Proudfit* held that the second note acted to renew the original obligation secured by the trust deed, and that the mortgagee creditor retained his superior priority. *Id.*, 552 P.2d at 124.

In *Gray v. Kappos*, the Utah Supreme Court held the subsequently issued renewal notes in that case related back to the original purchase-money mortgage secured by the property then in question. As in *Proudfit*, the *Gray* court noted the fact that the original mortgage had not been released at the time the new notes were executed.

In contrast, here the original trust deed was released as of record by a deed of reconveyance executed in favor of the Lindemans. Had the parties wished in 1978 only to renew the obligation secured by the 1976 trust deed, they could have acted as did the parties in *Proudfit* and *Gray*: the Lindemans could have executed a renewal note secured by the 1976 trust deed. Instead, the parties chose a different course, the Lindemans' executing a new note and a new trust deed securing a new sum of money, and the Lockhart Company's trustee executing a deed of reconveyance extinguishing the 1976 trust deed.

The language of the trust deeds themselves harmonizes with the principles of *Proudfit* and *Gray*. The second paragraph of the 1976 trust deed provided that the deed secured

> the payment of such additional loans or advances as hereafter may be made to Trustor, or his successors or assigns, when evidenced by a promissory note or notes *reciting that they are secured by this Trust Deed*; . . . (emphasis added)

By the terms of the 1976 trust deed itself, if the parties had intended the 1978 note to be secured by the 1976 trust deed they had but to expressly say so. In actual fact, the 1976 trust deed was reconveyed to the Lindemans and a new promissory note executed reciting that it was secured by the new trust deed executed at the same time. This factual background generates a strong inference drawn from the terms of their written instruments, that it was the intent of the parties to satisfy and extinguish the 1976 deed and to secure the 1978 obligation with the 1978 trust deed.

This inference is buttressed by the language of the Utah statute dealing with the reconveyance of trust deeds. That statute provides, in pertinent part:

> When the obligation secured by any trust deed has been satisfied, the trustee shall, upon written request by the beneficiary, reconvey the trust property. . . .

Utah Code Ann. § 57–1–33 (1974).

When measured against the terms of the statute, the reconveyance by deed of the 1976 trust deed to the Lindemans by the Lockhart Company's trustee creates an independent inference that the obligation secured by that original deed had been satisfied rather than renewed.

The *Gant* decision relied upon so heavily by the plaintiff can now be effectively distinguished from the circumstances here. In *Gant*, the terms of the original deed provided that it "also secures any other indebtedness due said [mortgagee] now existing or hereafter created . . ." *quoted in* 43 A.F.T. R.2d, at 79–303. These terms are materially different from those of the Lindeman trust deed, which require an express recital by subsequent notes that they are to be secured by *that* trust deed. Further, the *Gant* court faced no inference drawn from statute that reconveyance of a trust deed indicates its satisfaction. Had the parties herein intended to achieve the result found in *Gant*, they need only to have said so. The terms of their instruments tell a distinctly different story. When placed of record, that story is what is told to the world.

■ On this basis, this Court finds that the execution of a second promissory note and trust deed by the Lindemans in 1978, and the reconveyance by the trustee of the 1976 trust deed extinguished the priority afforded the 1976 trust deed as against the federal tax lien thereafter filed as a matter of law.

■ Plaintiff tries to distinguish some of the federal tax lien filings from others, asserting that he takes the Lindeman property free of the federal tax lien as to amounts recorded subsequent to May 31, 1978, the date that the 1978 trust deed was recorded. In doing so, the plaintiff fundamentally misapprehends the nature of the federal tax lien encumbrance. The first filing of a federal tax lien notice at the location specified by law,[1] puts all persons on constructive legal notice that an encumbrance exists, that a federal tax lien appertains to the taxpayer's property.[2] The actual amount secured by that lien of necessity does not remain static. 26 U.S.C. section 6321 states:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (*including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto*) *shall be a lien* in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person. [emphasis added].

■ The accrual of interest, penalties, additional taxes, etc., is not a process frozen in time at the date of filing of the notice of federal tax lien. Over time, these elements of the delinquent taxpayer's liability continue to accumulate. The recorded notice does not give notice that the federal tax lien is limited to *only* the amount stated in the notice; rather, it puts any interested person on inquiry to discover the true extent and nature of the encumbrance. *See generally Crompton v. Jenson*, 78 Utah 55, 1 P.2d 242, 247 (1931). That the federal tax lien secures the taxpayer's obligation for the actual amount owing *as it accumulates* and *not* just that amount recorded in the notice seems uncontrovertible when considered with the relevant federal statutes. 26 U.S.C. § 6323, which governs the filing of notice of federal tax liens specifically provides for information on the exact amount

---

1. In Utah, the proper location for filing a notice of a federal tax lien is the office of the county recorder. Utah Code Ann. § 38–6–1. Utah law also requires the county recorder to maintain a numerical file and index of notices of federal tax liens. Utah Code Ann. § 38–6–2, –3.

2. Utah Code Ann. § 57–3–2 provides:

Record imparts notice.—Every conveyance, or instrument in writing affecting real estate, executed, acknowledged or proved, and certified, in the manner prescribed by this title, and every patent to lands within this state duly executed and verified according to law, and every judgment, order or decree of any court of record in this state, or a copy thereof, required by law to be recorded in the office of the county recorder, and every financing statement which complies with the provisions of § 70A–9–402 shall, from the time of filing the same with the recorder for record, impart notice to all persons of the contents thereof; and subsequent purchasers, mortgagees and lien holders shall be deemed to purchase and take with notice.

See generally, *Wilson v. Schneiter's Riverside Golf Course*, 523 P.2d 1226, 1227 (Utah 1974); *Smith v. Edwards*, 81 Utah 244, 17 P.2d 264, 269–70 (1932).

secured by a filed lien to be disclosed upon inquiry:

(i) *Special rules.*—

\* \* \* \* \* \*

(3) *Disclosure of amount of outstanding lien.*—If a notice of lien has been filed pursuant to subsection (f), the Secretary or his delegate is authorized to provide by regulations the extent to which, and the conditions under which, information as to the amount of the outstanding obligation secured by the lien may be disclosed.

The regulations authorized by 26 U.S.C. § 6323(i)(3) have been promulgated since 1976. At 26 C.F.R. § 301.6323(i)–1 (1980) those regulations expressly provide as follows:

\* \* \* \* \* \*

(c) *Disclosure of amount of outstanding lien.* If a notice of lien has been filed (see § 301.6323(f)–1), the amount of the outstanding obligation is authorized to be disclosed as a matter of public record on Form 668 "Notice of Federal Tax Lien Under Internal Revenue Laws." *The amount of the outstanding obligation secured by the lien remaining unpaid at the time of an inquiry is authorized to be disclosed to any person who has a proper interest* in determining this amount. *Any person who* has a right in the property or *intends to obtain a right in the property by purchase or otherwise, will upon presentation by him of satisfactory evidence be considered to have a proper interest.* Any person desiring this information may make his request to the office of the Internal Revenue Service named on the notice of lien with respect to which the request is made. The request should clearly describe the property subject to the lien, identify the applicable lien, and give the reasons for requesting the information. [emphasis added]

 The filing of the first notice of federal tax lien at the county recorder's office gave Peterson legal notice of the lien and put Peterson on inquiry as to its continuously accumulating amount. The adminis-

trative procedure outlined above is tailored to the needs of a prospective purchaser of property who, like Peterson, might and should be interested in the extent of federal encumbrance of the real property in question. It is well settled under Utah law that when notice of something is enough to excite a reasonable man's attention and put him on inquiry, it is notice of everything to which such inquiry might lead. *See Salt Lake, Garfield & Western Railway Company v. Allied Materials Company,* 4 Utah 2d 218, 291 P.2d 883, 885 (1955); *McGarry v. Thompson,* 114 Utah 442, 201 P.2d 288, 293 (1948); *O'Reilly v. McLean,* 84 Utah 551, 37 P.2d 770, 775 (1934), *quoting Wood v. Carpenter,* 101 U.S. 135, 141, 25 L.Ed. 807 (1879). Here, reasonable inquiry would have disclosed to Peterson the full amount of obligation secured by the lien on the Lindeman property filed in 1976.

 The additional notices of federal tax lien filed as to the Lindeman property after 1976 have no legal effect upon determination of the "first in time, first in right" priority of the federal tax lien. They serve instead as lawful public disclosure of the accumulating amounts of tax liability secured by the lien, pursuant to 26 C.F.R. § 301.6323(i)–1 (1980), *supra.* Since they are filed during the life of the lien, they acquire no independent priority of their own. The subsequent notices would gain a date of their own only if they are filed after the statutory refiling period of the first notice of lien has expired, a time period more than six years after filing of that first notice, which has yet to run in this litigation. *See* 26 U.S.C. § 6323(g).

 Even assuming *arguendo* that the separate filing of the notices of the additional amounts secured by the federal tax lien resulted in the creation of additional federal tax liens with individual priority dates, Peterson could not purchase the Lindeman property free of any federal right to recover the amount secured by the liens. Under 26 U.S.C. § 7425(d), if a nonjudicial sale of property subject to a federal tax lien is held to satisfy a lien prior to that of the United States, the United States

retains a right of redemption arising under federal law. While under Utah state law, a purchaser of property at a trustee's sale of a trust deed normally takes the property without a right of redemption in others, *see* Utah Code Ann., § 57–1–28(2), the sale cannot extinguish the federal right of redemption created by federal statute, *see* 26 U.S.C. § 7425(d). A federal right or power cannot be abrogated by a state law rule to the contrary. *See* U.S.Const., Art. VI, § 2; *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1819). 26 U.S.C. § 7425(d) allows the federal government to realize the full value of their lien interests, at least to the extent the value of the property can meet the obligation secured by them, while compensating the purchaser under the superior lien for the amount actually paid, plus interest and costs.[3] This statutory scheme protects the federal tax lien against any collusive transfers of a delinquent taxpayer's property made in an effort to escape the reach of the United States' enforcement powers under the revenue laws, while at the same time recognizing the rights of a senior lien creditor whose claim to the property is truly "first in time, first in right", and the rights of those who lawfully purchased through or under him.

## III. CONCLUSION

In summary, the plaintiff's claims for equitable, or in the alternative, legal relief are wholly without merit.[4] As a consequence, the plaintiff's motion for summary judgment shall be denied in all respects, and the defendant's motion for summary judgment shall be granted in all respects.

**3.** 26 U.S.C. § 7425(d)(2) provides that 28 U.S.C. § 2410(d) governs the amount to be paid to the party from whom the property in question is redeemed.

**4.** Having previously disposed of the priority issue, it seems apparent that no other reason exists for finding that Peterson purchased the interest represented by the 1978 trust deed free of the federal tax lien affecting the Lindeman property. The United States did not consent to the sale of the property to Peterson free of the

tax lien, *see* 26 U.S.C. § 7425(b), (c)(2); formal notice had not been served upon the Secretary of the Treasury or his delegate that the sale to Peterson was to take place, *see* 26 U.S.C. § 7425(b), (c)(1); nor had the federal tax liens been recorded at a time less than 30 days prior to the trustee's sale, *see* 26 U.S.C. § 7425(b). Plaintiff Peterson purchased from the trustee subject to the encumbrance reflected in the recorded federal tax lien.