**THET MAH AND ASSOCIATES, INC., Plaintiff, Appellee and Cross-Appellant,**

v.

**FIRST BANK OF NORTH DAKOTA (NA), MINOT, Defendant and Appellee,**

and

**The General Fixture and Supply, Inc., Defendant, Appellant and Cross-Appellee.**

**Civ. No. 10357.**

Supreme Court of North Dakota.

June 24, 1983.

Pringle & Herigstad, Minot, for plaintiff, appellee and cross-appellant; argued by Jan M. Sebby, Minot.

Anderson & Dobrovolny, Minot, for defendant and appellee; argued by Donald A. Anderson, Minot.

McGee, Hankla, Backes & Wheeler, Minot, for defendant, appellant and cross-appellee; argued by Russel G. Robinson, Minot.

SAND, Justice.

■ The General Fixture and Supply, Inc. (hereinafter General Fixture), appealed from a district court decision in a declaratory judgment[1] action in which the district court determined that First Bank of North Dakota (NA) Minot (hereinafter First Bank) had a purchase money security interest in equipment superior to General Fixture's purchase money security interest in the same equipment and ordered $30,000.00 in proceeds from the sale of that equipment held by Thet Mah and Associates, Inc. (hereinafter Thet Mah), to be paid to First Bank.

First Bank, through its senior vicepresident, Robert Turner, sent a letter dated 14 January 1980 to Dan Schmaltz, president of Dakota Square Restaurants, Inc. (hereinafter Dakota Square), putting into writing a loan request (offer of loan commitment) by Dakota Square for a loan to equip a restaurant and lounge in the Dakota Square Mall at Minot, North Dakota. The letter referred to a total projected capital cost of $310,000.00, with $120,000.00 of that total for equipment, furniture, small wares, uniforms, and supplies. Dakota Square,

through Dan Schmaltz, accepted the loan commitment on 22 January 1980.

On 7 March 1980 First Bank advanced the sum of $25,000.00 to Dakota Square pursuant to the commitment letter, and Dakota Square executed a security agreement in favor of First Bank covering all of Dakota Square's equipment, supplies, furniture, and fixtures described in an attached list. A financing statement was filed on 12 March 1980 with the Ward County Register of Deeds and the Secretary of State. The financing statement provided that it covered the following collateral:

> "All inventory wherever located, now existing or hereafter acquired, and all accounts and contract rights now existing or hereafter acquired. All equipment, supplies, furniture and fixtures now owned or hereafter acquired."

On 28 May 1980 Dakota Square entered into a contract for sale and security agreement with General Fixture for the purchase by Dakota Square of certain restaurant equipment for a total cost of $87,292.25. General Fixture filed a financing statement covering the equipment on 23 June 1980.

General Fixture, through its credit manager Jim Butts, sent First Bank a request, dated 5 June 1980, to fill out a "form letter for commitment of funds" for Dakota Square. First Bank, through Turner, replied on 12 June 1980 that it did not have information from Dakota Square regarding the dollar amount of the purchases from General Fixture. The reply also stated that First Bank had consented to a dollar-

---

1. The "declaratory judgment" consists of a memorandum opinion dated 1 December 1982 which the court treated as a final judgment by erroneously interpreting NDCC § 32–23–01 which provides, in part, as follows:

"No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect, and *such* declaration shall have the force and effect of a final judgment or decree." [Emphasis added.]

The term "such" refers to the declaratory judgment or decree mentioned earlier in the statute, and does not dispense with the formal entry of a judgment or decree. The statute, in effect, merely states that such declaratory judgment or decree is a final judgment rather than an interlocutory judgment. A supplemental order and judgment was filed 17 December 1982 nunc pro tunc to 1 December 1982, which is a hybrid and only by a strained construction can we recognize it on appeal as an item falling within the statutory provisions as to what is appealable. See NDCC Ch. 28–27 and specifically § 28–27–02. In the future such practice may result in denying the appeal on grounds of lack of jurisdiction.

amount loan for all phases of the restaurant—including equipment.

On 17 July 1980 General Fixture delivered the equipment to Dakota Square, and Schmaltz wrote First Bank a letter authorizing First Bank to specifically hold $45,000.00 in funds committed to Dakota Square for direct payment to General Fixture after satisfactory delivery and installation of the equipment and notification by Schmaltz.

On 18 July 1980 Turner wrote General Fixture certifying that First Bank had committed funds in the amount of $45,000.00 for the equipment for the restaurant. The letter stated that the funds would be made available upon completion of General Fixture's contract with Dakota Square and in connection with the opening of the establishment.

The equipment was installed between 2 August and 19 August 1980 and the grand opening of the restaurant was on 29 September 1980. On 29 September 1980 Schmaltz authorized First Bank to transfer the $45,000.00 to the Dakota Square account and Dakota Square subsequently wired the money to a bank in Ohio for credit to General Fixture.

In May 1981 Dakota Square and Thet Mah executed a contract for the sale of the restaurant to Thet Mah. After execution of the contract for sale, the total purchase price ($200,000.00) was deposited with counsel for Thet Mah for distribution to Dakota Square and its creditors. After other disbursements, the remaining proceeds from the sale ($30,000.00) were insufficient to pay the secured claims of both First Bank and General Fixture. Dakota Square's indebtedness to General Fixture was $30,000.00, and to First Bank was in excess of $30,000.00.

Because of the possible conflicting security interests held by First Bank and General Fixture and because the $30,000.00 in proceeds was insufficient to pay the claims of both First Bank and General Fixture, Thet Mah commenced an action for declaratory judgment and interpleader and asked the trial court to declare the rights of the parties; to direct Thet Mah concerning the disposition of the proceeds; and to declare Thet Mah's title to the equipment purchased from Dakota Square free of security interest claimed by First Bank and General Fixture.

The district court determined that both General Fixture and First Bank had a purchase money security interest in the equipment; that the security interest of both parties attached at the same time (delivery of the equipment to Dakota Square); and that First Bank had priority to the proceeds of the sale because it was the first to file its financing statement. The court ordered the $30,000.00, with interest, to be paid to First Bank. The trial court also determined that the security interest of General Fixture on the equipment remained attached to the collateral, junior to the security interest of First Bank to the extent First Bank's security interest was unpaid or unreleased.

General Fixture appealed to this Court and contended that First Bank did not have a purchase money security interest or, if it did, that the security interest was inferior to the purchase money security interest held by General Fixture.

The principal issue is which security interest has priority—the one held by First Bank or the one held by General Fixture. However, in resolving this issue we must first consider if the security interest[2] held

---

2. A security interest is defined in NDCC § 41–01–11(37), which provides as follows:

" 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (section 41–02–46) is limited in effect to a reservation of a 'security interest'. The term also includes any interest of a buyer of accounts or chattel paper which is subject to chapter 41–09. The special property interest of a buyer of goods on identification of such goods to a contract for sale under section 41–02–46 is not a 'security interest', but a buyer may also acquire a 'security interest' by complying with chapter 41–09. Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' but a consignment

by either or both constituted a purchase money security interest as defined in North Dakota Century Code § 41–09–07.

NDCC § 41–09–07 provides as follows:
"A security interest is a 'purchase money security interest' to the extent that it is

1. taken or retained by the seller of the collateral to secure all or part of its price; or
2. taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used."

 Initially, we note, and First Bank apparently concedes, that General Fixture qualifies as a purchase money security interest pursuant to NDCC § 41–09–07(1). Because First Bank did not sell the equipment to Dakota Square, in order for it to have a purchase money security interest, it must qualify pursuant to NDCC § 41–09–07(2) by giving value by making advances or incurring an obligation which enable the debtor (Dakota Square) to acquire rights in or the use of the equipment.

General Fixture contended that First Bank's advance to Dakota Square to make part payment for the equipment occurred on or about 29 September 1980, well after the receipt and installation of the collateral and, therefore, First Bank did not give value to enable Dakota Square to acquire rights in or the use of the collateral within the meaning of NDCC § 41–09–07(2).

 The official comments to Uniform Commercial Code § 9–107 [NDCC § 41–09–07], reflect that the value given must be present consideration and cannot be taken as security for, or in the satisfaction of, a preexisting claim or antecedent debt. For purposes of the Uniform Commercial Code, a person gives value for rights if he ac-

quires them in return for a binding commitment to extend credit, and generally for any consideration sufficient to support a simple contract. NDCC § 41–01–11(44)(a) and (d). If a secured party has bound himself to make an advance, the advance is made pursuant to commitment. NDCC § 41–09–05(1)(k).
"A secured party may give value just as fully by committing himself to supply goods or money as he does if he actually supplies the goods or furnishes the money at the time the agreement is made." 1 Bender's Uniform Commercial Code Service, Secured Transactions, § 4.05(4), p. 304 (1983).

*See also, Honea v. Laco Auto Leasing, Inc.,* 80 N.M. 300, 454 P.2d 782 (1969).

 We believe that the "loan commitment" executed by First Bank on 14 January 1980 and accepted by Dakota Square on 22 January 1980 constituted an incurred obligation which was a binding commitment on First Bank and satisfied the value requirement for a purchase money security interest. The advance given on 7 March 1980 further reflects that the loan commitment was a binding commitment sufficient to satisfy the requirement of value. Nothing in the record suggests that, at least by the time of the advance on 7 March 1980, the loan commitment was conditional. Furthermore, the record reflects that this binding commitment was acted upon and relied upon by the parties in their actions involving the equipment. In this respect the loan commitment enabled Dakota Square to acquire the use of the equipment. We conclude that the security interest of First Bank satisfied the requirements for a purchase money security interest.

General Fixture contended that even if First Bank had a purchase money security interest, its purchase money security interest attached after General Fixture's at-

---

is in any event subject to the provisions on consignment sales (section 41–02–43). Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agree-

ment that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

tached and, therefore, General Fixture had priority.

██ The requisites for a security interest to attach are the existence of an agreement that the security agreement attach, value must have been given, and the debtor must have rights in the collateral. NDCC § 41–09–16(1). The value necessary for purposes of attachment is the same requirement of value for purposes of determining whether or not a security interest is a purchase money security interest. In this instance, General Fixture accomplished all the requisites of attachment pursuant to NDCC § 41–09–16 no later than when Dakota Square acquired rights in the collateral and its security interest attached at that time. First Bank also accomplished all of the requisites of attachment pursuant to NDCC § 41–09–16 when Dakota Square acquired rights in the collateral and its security interest attached at that time. Thus, the security interest of both General Fixture and First Bank attached at the same time.

██ Because First Bank and General Fixture held purchase money security interests which attached at the same time, priority is determined pursuant to NDCC § 41–09–33(5)(a), which provides as follows:

"5. In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections 3 and 4), priority between conflicting security interests in the same collateral shall be determined according to the following rules:

a. Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection."

In this instance, First Bank filed its security interest on 12 March 1980, and General Fixture filed its security interest on 23 June 1980. Consequently, the purchase money security interest of First Bank is superior to and has priority over General Fixture's purchase money security interest and First Bank was entitled to the proceeds held by Thet Mah.

██ Thet Mah cross-appealed from the portion of the trial court's determination that General Fixture's security interest on the equipment remained attached to the collateral junior to First Bank's security interest to the extent that it was unpaid or unreleased.

The trial court, in its memorandum decision, framed this issue as "the second aspect of the motion for declaratory judgment which asks the Court to declare that the Plaintiff [Thet Mah] takes the property it purchased from the debtor [Dakota Square] free of any security lien." The trial court concluded that "the lien of General Fixture as a secured creditor upon the collateral sold by the debtor [Dakota Square] to the Plaintiff [Thet Mah] continues impressed on that collateral, however it is junior to the lien of the First Bank to the extent that First Bank remains unpaid upon its unreleased security interest it has in the collateral."

The issue raised by Thet Mah is "whether Thet Mah, as purchaser of property subject to prior and junior security interests, obtains title to the property superior to the junior security interest when the sale proceeds are applied to pay the prior security interest."

NDCC § 41–09–27(2) provides that:

"Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

The record does not reflect that the secured parties, First Bank or General Fixture, authorized the disposition of the collateral either in the security agreement or

otherwise. Neither does the transaction between Thet Mah and Dakota Square fit within any of the exceptions of NDCC Ch. 41–09. *See, e.g.,* NDCC §§ 41–09–28; 41–09–29; 41–09–30.

We conclude that General Fixture's security interest continues in the collateral as required by NDCC § 41–09–27(2). We believe such a result is fair and logical because Thet Mah bought the property from Dakota Square with notice of the security interest in the same collateral held by First Bank and General Fixture.

The district court decision is affirmed.

ERICKSTAD, C.J., and VANDE WALLE, PEDERSON and PAULSON, JJ., concur.